UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BRIAN J. KELLY, <br><br> Plaintiff, <br><br> v. <br><br> MAX HUGEL, <br><br> Defendant, <br><br> ROCKINGHAM VENTURE, INC., <br><br> Defendant and <br> Reach-and-Apply <br> Defendant. | CIVIL ACTION <br> NO. 05-CV-10460-DPW |

## ANSWER, COUNTERCLAIMS, AND JURY DEMAND OF MAX HUGEL

Pursuant to Fed. R. Civ. P. 8, defendant, Max Hugel, hereby responds to the Verified Complaint ("Complaint") as follows, in numbered paragraphs corresponding to those of the Complaint.

### Allegations Common to All Counts

#### Parties

1.    Mr. Hugel admits, upon information and belief, the allegations contained in paragraph 1.

2.    Denied.  Further answering, Mr. Hugel admits that he has a summer home at the address stated in paragraph 2 and states that he permanently resides in Ocala, Florida and is a citizen of Florida.

3.    Admitted.

LITDOCS/596267.1

## Jurisdiction and Venue

4.    Mr. Hugel states that the allegations contained in paragraph 4 set forth conclusions of law, as to which no response is required, and states that the documents referenced in paragraph 4 speak for themselves and are the best evidence of their terms.

## Count I – Breach of a Promissory Note against Hugel

5.    Mr. Hugel restates, realleges, and incorporates his responses to paragraphs 1-4 as though the same were fully set forth herein.

6.    Mr. Hugel admits the allegations of the first sentence of paragraph 6 and, as to the second sentence, states that the document referenced in paragraph 6 speaks for itself and is the best evidence of its terms.

7.    Mr. Hugel admits nonpayment of the principal balance of the Note in cash; admits that Mr. Kelly purported to give written notice of a certain waiver on November 24, 2003; and denies the remaining allegations of paragraph 7.  Further answering, Mr. Hugel states that the obligations of the Note have been fully satisfied on the basis set forth in his Counterclaim.

8.    Denied.

## Count II – Breach of Contract under a Stock Pledge Agreement against both Defendants

9.    Mr. Hugel restates, realleges, and incorporates his responses to paragraphs 1-8 as though the same were fully set forth herein.

10.    Admitted.

11.    Mr. Hugel admits that the allegations contained in paragraph 11 purport to quote portions of the Stock Pledge Agreement.  Further answering, Mr. Hugel states that the document referenced in paragraph 11 speaks for itself and is the best evidence of its terms.

12.    Mr. Hugel admits the existence of the document referred to in paragraph 12 and that plaintiff loaned him $5,000,000; states that the remaining allegations contained in paragraph 12 set forth conclusions of law, as to which no response is required; denies the

same to the extent that they allege facts; and states that the document referenced in paragraph 12 speaks for itself and is the best evidence of its terms.

13.     Mr. Hugel admits that the principal balance of the Note was not repaid and denies the remaining allegations of paragraph 13. Further answering, Mr. Hugel states that the obligations evidenced by the Note have been fully satisfied on the basis set forth in the Counterclaim.

14.     Mr. Hugel admits that the letter attached as Exhibit C to the Complaint was sent to Rockingham Venture, Inc. on or about September 14, 2004 and denies the remaining allegations of paragraph 14.

15.     Mr. Hugel admits that the allegations contained in paragraph 15 purport to quote or paraphrase portions of the Stock Pledge Agreement and denies that such portions are applicable in this case.  Further answering, Mr. Hugel states that the allegations contained in paragraph 15 set forth conclusions of law, as to which no response is required, and states that the document referenced in paragraph 15 speaks for itself and is the best evidence of its terms.

16.     Upon information and belief, Mr. Hugel denies the allegations of paragraph 16.

17.     Denied.

## Count III – Action to Reach and Apply Hugel's Shares in Rockingham Venture

18.     Mr. Hugel restates, realleges, and incorporates his responses to paragraphs 1-17 as though the same were fully set forth herein.

19.     Denied.

20.     Denied.

21.     No response is required to the allegations of paragraph 21, as the allegations merely state plaintiff's alleged purpose in bringing Count II of the Complaint. To the extent a response is deemed to be required, Mr. Hugel denies the allegations of paragraph 21.

22.     Denied.

**Count IV – Action to Reach and Apply Amounts Rockingham Venture Owes to Hugel**

23.    Mr. Hugel restates, realleges, and incorporates his responses to paragraphs 1-22 as though the same were fully set forth herein.

24.    Admitted.

25.    Denied.

26.    Denied.

27.    Denied.

## Prayers for Relief

Mr. Hugel denies that plaintiff is entitled to any of the relief demanded in the Complaint, including any and all relief demanded in Sections A through D of the Prayers for Relief.

## SEPARATE AND AFFIRMATIVE DEFENSES

1.    The Complaint fails, in whole or in part, to state a claim upon which relief may be granted.

2.    Plaintiff is not entitled to any of the prejudgment relief he seeks.

3.    Plaintiff has failed to establish entitlement to injunctive relief.

4.    Plaintiff has failed to establish entitlement to reach-and-apply relief.

5.    Plaintiffs' claims are barred, in whole or in part, by an accord and satisfaction.

6.    Plaintiffs' claims are barred, in whole or in part, by plaintiff's bad faith and by the doctrine of unclean hands.

7.    Plaintiffs' claims are barred, in whole or in part, by plaintiff's own acts, omissions, conduct, and activities.

8.    Plaintiff has engaged in conduct and activities with respect to the subject matter of this action, by which conduct and activities plaintiff is estopped from asserting any claims against Mr. Hugel and from seeking any other relief whatsoever.

LITDOCS/596267.1

## Jury Demand

MR. HUGEL DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE

WHEREFORE, defendant Max Hugel denies that plaintiff is entitled to any of the relief sought in the Complaint, or to any another relief, and prays that this Court:

(a)    deny in their entirety plaintiff's requests for pre-judgment relief, including plaintiff's requests for injunctive relief;

(b)    dismiss the Complaint in its entirety with prejudice;

(c)    enter judgment against plaintiff and for Mr. Hugel on all counts of the Complaint;

(d)    order that plaintiff take nothing by this action;

(e)    award Mr. Hugel his costs of suit and reasonable attorneys' fees incurred herein to the extent permitted by applicable law; and

(f)    award Mr. Hugel such other and further relief as the court deems just and proper.

## COUNTERCLAIMS

### Introduction

This is an action for declaratory judgment and for breach of contract, breach of the covenant of good faith and fair dealing, and violation of Mass. Gen. Laws ch. 93A, §§ 2, 11.

### The Parties

1.    Plaintiff-in-counterclaim, Max Hugel, resides in Ocala, Florida. Mr. Hugel owns stock in, and is chairman of the board of, Rockingham Venture, Inc. ("RVI"), a New Hampshire corporation with a principal place of business at 77 Rockingham Park Boulevard, Salem, New Hampshire 03079.

2.    Upon information and belief, defendant-in-counterclaim, Brian J. Kelly, resides at 55 Sandy Pond Road, Lincoln, Massachusetts 01773. Kelly is a principal in and controls Eastern Development, LLC ("Eastern"). Both Kelly and Eastern have a principal place of business at 120 Presidential Way, Suite 300, Woburn, MA 01801.

**Facts**

3.      RVI owns approximately 171 acres of prime developable land in Salem, New Hampshire -- the largest and best strategically located parcel of commercially developable real estate in southern New Hampshire -- on which the Rockingham Park Race Track sits (the "RVI Property"). RVI also owns and operates the Rockingham Park Race Track.

4.      Kelly and his company, Eastern, have long been interested in acquiring the RVI Property. In December 2000, Kelly loaned Mr. Hugel $5 million (the "Loan") per the terms of a December 29, 2000 Promissory Note (the "Note"). Pursuant to a Stock Pledge Agreement of even date (the "SPA"), the Loan was secured by a first priority security interest in and lien on 40 of Mr. Hugel's 80 shares of stock in RVI. The pledged stock represents 20% of the issued and outstanding stock of RVI. Since December 29, 2000, Mr. Hugel has fully performed his obligations under the Loan by making timely quarterly interest payments thereon, each in the amount of $56,250.

5.      Principals of RVI (often through Mr. Hugel) and Eastern (often through Kelly) have a long history of negotiations, offers, and contractual arrangements concerning the potential sale of the RVI Property to Eastern or to Eastern affiliates or shells. Kelly made the Loan, in part, to position himself to acquire the RVI Property through Eastern or an Eastern affiliate. Since making the Loan, Kelly has played both sides against the middle, using the Loan as a means of pressuring Mr. Hugel to cede to Kelly Mr. Hugel's stock in RVI, while at the same time leading Mr. Hugel to believe that his obligations under the Note would be discharged through the sale of the RVI Property to Eastern or to an Eastern affiliate.

6.      On or about October 28, 2002, RVI and WPS Venture, LLC ("WPS"), an entity controlled by Eastern and by Kelly, and with the same principal place of business as Eastern and Kelly, entered into a purchase and sale agreement (the "2002 Purchase and Sale Agreement"), pursuant to which WPS agreed to purchase the RVI Property for $70 million.

The 2002 Purchase and Sale Agreement was negotiated by Mr. Hugel and others acting on behalf of RVI and by employees and agents of Eastern.

7.    As part of the 2002 Purchase and Sale Agreement, WPS agreed to satisfy existing mortgages on the RVI Property in the amount of $10 million (the "2002 Mortgage Loan"), with this amount to be credited toward the purchase price if the sale closed or, in the event of a termination of the 2002 Purchase and Sale Agreement, repaid by RVI within six months of the termination.

8.    The 2002 Purchase and Sale Agreement required WPS to use diligent efforts to obtain certain permits within 18 months of the closing date of the 2002 Mortgage Loan and gave WPS the right to extend the permitting period for up to two successive periods of six months each.

9.    Nevertheless, approximately six months after the 2002 Purchase and Sale Agreement closed, WPS terminated the 2002 Purchase and Sale Agreement, claiming that it would be unsuccessful in obtaining the required permits but, in reality, in an effort to reduce the price.    The termination of the 2002 Purchase and Sale Agreement triggered RVI's obligation to re-pay WPI for the 2002 Mortgage Loan.

10.    After WPS terminated the 2002 Purchase and Sale Agreement, Mr. Hugel and Kelly continued to discuss the sale of the RVI Property to Eastern or an Eastern affiliate. Throughout 2003 and 2004, Kelly also pressed Mr. Hugel to give up his RVI stock to Kelly.

11.    After WPS terminated the 2002 Purchase and Sale Agreement, RVI also negotiated with another company, CBL & Associates Properties, Inc. ("CBL"), for the purchase and sale of the RVI Property. Learning of the maturation of the CBL negotiations, Kelly attempted to use the Note as leverage to block those negotiations.    On or about November 24, 2003, Kelly notified Mr. Hugel that he would not exercise a certain conversion right he had under the Note and that he expected full payment on the Loan by August 24, 2004.

-7-

12.     In December 2003, RVI entered into a purchase and sale agreement with CBL to sell the RVI Property for $70 million (the "2003 CBL Agreement"). As part of that agreement, a CBL affiliate loaned $10 million to RVI (the "CBL Loan") to pay off RVI's 2002 Mortgage Loan obligation to the Eastern affiliate WPS.

13.     In April 2004, CBL terminated the 2003 CBL Agreement. Upon information and belief, CBL terminated the 2003 CBL Agreement because it did not want to deal with the prospect of having Kelly as a shareholder partner. CBL claims that, as a result of the termination, RVI must now repay the CBL Loan by May 31, 2005.

14.     Nevertheless, RVI continued to negotiate with CBL during the spring and summer of 2004. In August 2004, CBL made another proposal to buy the RVI Property (the "August 2004 CBL Proposal"), which RVI rejected.

15.     Pursuant to the SPA, Kelly was provided with copies of the 2003 CBL Agreement and the August 2004 CBL Proposal and also was notified of RVI's rejection of the agreement and proposal, respectively.

16.     In the months prior to September 2004, Elliot Levine, Mr. Hugel's accountant and agent, discussed with Kelly the possibility of an extension on the Loan to Mr. Hugel. While leading Mr. Levine to believe that he would take no action adverse to Mr. Hugel that could be avoided with an extension (and, thus, that it was not necessary for Mr. Hugel to seek alternative financing), Kelly ultimately refused to grant an extension in order to "keep the pressure on" Mr. Hugel for his own purposes in aid of his efforts to acquire control of the RVI Property through Eastern or an Eastern affiliate.

17.     During this time period, Kelly, through Eastern (or an Eastern affiliate), continued to discuss the purchase and sale of the RVI Property and made a proposal to buy the RVI Property for $49 million, which RVI rejected.

18.     On or about September 14, 2004, as part of his continued effort to manipulate the sale of the RVI Property, Kelly sent to Mr. Hugel a notice of default on the Loan. Thereafter, Mr. Levine negotiated with Kelly an agreement concerning the Loan.

-8-

19.    In October, 2004, Kelly and Mr. Hugel (acting through his agent, Mr. Levine) entered into a binding agreement to resolve all outstanding disputes (the "Conveyance Agreement"). Pursuant to the Conveyance Agreement, Kelly agreed to waive and discharge Mr. Hugel from all obligations related to payment on the Note and to pay Mr. Hugel $375,000 in cash, and Mr. Hugel agreed to convey to Kelly the 40 shares pledged under the SPA. The parties also agreed that Raymond Murphy, Eastern's General Counsel, would take the lead in the ministerial task of memorializing the Conveyance Agreement.

20.    The issue of potential tax liabilities arising from the Conveyance Agreement was front and center during the negotiations of the Conveyance Agreement. As discussed by Mr. Levine and Kelly, the purpose of the agreed-upon $375,000 payment to Mr. Hugel was to cover Mr. Hugel's tax liabilities in connection with the transfer of the 40 shares under the Conveyance Agreement.

21.    In late October and early November, 2004, Mr. Murphy (on behalf of Kelly) and Andrew Dunn (on behalf of Mr. Hugel) exchanged drafts documenting the Conveyance Agreement. During this time, Kelly's representatives pressured Mr. Hugel to represent in the documents memorializing the Conveyance Agreement that the 40 shares in RVI that Mr. Hugel agreed to convey to Kelly as part of the Conveyance Agreement were worth no more than $5 million. The Conveyance Agreement required no such representation. Moreover, the requested representation was demonstrably false, as could easily be shown by, for example, public documents on file with the New Hampshire authorities with oversight over RVI's racing operations. Kelly abandoned his request for the representation.

22.    During this period, Kelly initiated the process, required of any owner of an interest in RVI, of being vetted by the New Hampshire Attorney General's office and seeking the approval of the New Hampshire Racing Commission. Upon information and belief, the process was completed and Kelly was approved by the New Hampshire Racing Commission.

23.    In or about mid-November 10, 2004, Mr. Murphy and Mr. Dunn communicated concerning additional documents requested by Kelly, including the 2004 CBL offer to buy the RVI Property. The parties also agreed to move the closing date for the Conveyance Agreement to January 2005. This was done at the request of Kelly, who had decided that he wanted to move the closing to 2005 for tax reasons.

24.    During the fall and winter of 2004, RVI continued to discuss the purchase and sale of the RVI Property with both CBL and Eastern. In or about early December 2004, RVI sent to CBL, Eastern, and other interested parties a request for proposals and term sheet providing for the sale of the RVI Property. CBL and Eastern each responded with offers to buy the RVI Property for $60 million.

25.    RVI decided to reject the CBL offer and to accept the Eastern offer, which accepted all of RVI's terms and provided for more money down. On or about December 29, 2004, RVI and Heritage Rock LLC ("Heritage"), another Eastern shell company controlled by Eastern and Kelly, entered into an agreement for the purchase and sale of the RVI Property at $60 million, based upon the term sheet of even date. The agreement provided for a 30-day exclusivity period.

26.    On or about January 7, 2005, RVI proposed to Heritage documents for the purchase and sale agreement, based on the December 29, 2004 term sheet.

27.    On or about January 28, 2005, Heritage sent a letter to RVI purporting to terminate the negotiations and the December 29, 2004 agreement between Heritage and RVI.

28.    On or about February 16, 2005, Mr. Kelly abruptly gave notice that he would refuse to perform the Conveyance Agreement.

29.    On or about March 4, 2005, Mr. Dunn wrote to Mr. Murphy, stating that there was a binding agreement between the parties and that Mr. Hugel stood ready, willing, and able to perform it.

30.    On March 7, 2005, Kelly sued Mr. Hugel and RVI.

## Count I
## (Declaratory Judgment)

31.    Mr. Hugel repeats and realleges the facts contained in paragraphs 1-30 of the Counterclaim as if fully set forth herein.

32.    As alleged above, an actual controversy exists between Mr. Hugel and Kelly concerning whether Mr. Hugel is entitled to $375,000 from Mr. Kelley and whether all obligations of Mr. Hugel to Kelly under the Note and otherwise have been satisfied and discharged through the conveyance by Mr. Hugel to Kelly of 40 shares of common stock of RVI.

33.    Pursuant to 28 U.S.C. § 2201 and applicable state law, Mr. Hugel is entitled to a declaratory judgment by this Court as to the rights and obligations of the parties in this matter. Specifically, Mr. Hugel is entitled to a declaratory judgment that he is entitled to $375,000 from Kelly and that Mr. Hugel owes nothing to Kelly.  Mr. Hugel is also entitled to further relief as may be warranted under 28 U.S.C. § 2202.

## Count II
## (Breach of Contract)

34.    Mr. Hugel repeats and realleges the facts contained in paragraphs 1-33 of the Counterclaim as if fully set forth herein.

35.    As described above, Kelly and Mr. Hugel (through his agent, Mr. Levine) entered into the Conveyance Agreement in October 2004, pursuant to which Kelly agreed to waive and discharge Mr. Hugel from all obligations related to payment on the Note and to pay Mr. Hugel $375,000 in exchange for Mr. Hugel's conveyance to Kelly of the 40 shares pledged under the SPA.

36.    Mr. Hugel has fully or substantially performed all of his obligations under the Conveyance Agreement.

37.    As described above, Kelly breached the Conveyance Agreement by repudiating the Conveyance Agreement and by failing and refusing to perform his obligations under the Conveyance Agreement, including but not limited to (a) the obligation to cancel any and all

obligations of Mr. Hugel to Mr. Kelly (including any and all interest obligations) under the Note and the SPA and (b) the obligation to pay Mr. Hugel $375,000.

38.     Kelly's breach and repudiation of the Conveyance Agreement excused Mr. Hugel from any obligation to Kelly under the Conveyance Agreement, the Note, and the SPA.

39.     As a result of Kelly's breach and repudiation of the Conveyance Agreement, Mr. Hugel has suffered and will suffer damages in an amount to be proven at trial and also is entitled to attorneys' fees and costs incurred as a result of Kelly's refusal to honor the Conveyance Agreement.

## Count III
### (Breach of the Covenant of Good Faith and Fair Dealing)

40.     Mr. Hugel repeats and realleges the facts contained in paragraphs 1-39 of the Counterclaim as if fully set forth herein.

41.     Operative law implies a covenant of good faith and fair dealing in every contract. The Note contains an implied covenant that Kelly, as obligee thereunder, would not exploit the obligations under the Note as leverage with respect to the RVI Property or to avoid contractual obligations with respect to the RVI Property or to compel RVI to do business with him or entities controlled by him.

42.     As described above, Kelly has, by his conduct, breached the covenant of good faith and fair dealing implied into the Note.

43.     As a result of Kelly's breach of the covenant of good faith and fair dealing, Mr. Hugel has suffered damages in an amount to be established at trial.

## Count IV
### (Violation of Mass. Gen. Laws ch. 93A, §§ 2, 11)

44.     Mr. Hugel repeats and realleges the facts contained in paragraphs 1-43 of the Counterclaim as if fully set forth herein.

45.     At all times relevant hereto, Kelly was engaged in business and commercial activities in his dealings with Mr. Hugel and RVI and this claim arises out of those activities,

which were commercial activities in trade or commerce occurring primarily or substantially within the Commonwealth of Massachusetts.

46.    Over a period spanning several years, Kelly engaged in a repeated pattern of unfair and deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A, §§ 2, 11. This conduct included (a) use of his lending relationship with Mr. Hugel to further his own purposes in seeking to control and dominate the RVI Property, and to force the sale of the RVI Property to entities controlled by him at a below-market price; (b) causing Eastern and/or Eastern-related entities to make offers and enter into negotiations and agreements for the sale of the RVI Property, while simultaneously manipulating his negotiations with Mr. Hugel, in order to prevent others from purchasing the RVI Property; and (c) deliberate and unlawful repudiation and termination of the Conveyance Agreement in order to force more attractive terms in connection with the sale of the RVI Property.

47.    As described above, Kelly has, in violation of Mass. Gen. Laws ch. 93A, knowingly and willfully violated the statute and engaged in an intentional and wrongful course of conduct, which has included misrepresentation, deceit, and deliberate unreasonable conduct with respect to (a) the Conveyance Agreement; (b) use of his lending relationship with Mr. Hugel to further his own purposes in seeking to acquire the RVI Property through Eastern and/or Eastern-related entities; and (c) causing Eastern and/or Eastern-related entities to make offers and enter into negotiations and agreements for the sale of the RVI Property in order to keep others from purchasing the RVI Property. Kelly's course of conduct constitutes unfair and deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A.

48.    As described above, Kelly's course of conduct deprived Mr. Hugel of profits as an RVI shareholder that he would have enjoyed through the sale of the RVI Property to others, including CBL. It also caused Mr. Hugel to incur interest on the Note that he otherwise would not have incurred because, were it not for Kelly's conduct in violation of Mass. Gen. Laws ch. 93A, Mr. Hugel would have been able to discharge his obligations under the Note at an earlier time, whether through sale of the RVI Property to another or alternative financing arrangements.

49.     As a result of Kelly's unfair and deceptive acts, Mr. Hugel has suffered and will suffer substantial damages, including loss of money and property.

WHEREFORE, plaintiff-in-counterclaim, Max Hugel, prays that this Court:

(a)     enter a judgment on Count I declaring the respective rights, duties, and liabilities of the parties under the contracts at issue and at law; specifically, that Mr. Hugel owes nothing to Kelly under the Note or the SPA and that Kelly owes Mr. Hugel $375,000 under the Conveyance agreement;

(b)     enter judgment in favor of Mr. Hugel and against defendant-in-counterclaim, Brian Kelly, on all counts of the Counterclaim;

(c)     award Mr. Hugel such damages as he proves he has sustained as a result of Kelly's actions;

(d)     ascertain and award Mr. Hugel treble damages caused by the unfair and deceptive practices of Kelly, together with attorneys' fees;

(e)     enter an order requiring that Kelly perform his obligations under the Conveyance Agreement;

(f)     award Mr. Hugel his costs and attorneys' fees; and

(g)     enter any such further relief as the Court deems proper and just.

MR. HUGEL DEMANDS A JURY TRIAL ON HIS COUNTERCLAIMS

Respectfully submitted

MAX HUGEL,

By his attorneys,

Sabin Willett, BBO# 542519
Rheba Rutkowski, BBO # 632799
BINGHAM McCUTCHEN LLP
150 Federal Street
Boston, MA  02110
(617) 951-8000

Dated:  April 11, 2005

## CERTIFICATE OF SERVICE

I, Rheba Rutkowski, hereby certify that, on April 11, 2005, a true copy of the above document was served by first-class mail, postage prepaid, upon Christopher A. Kenney of Sherin and Lodgen LLP, 101 Federal Street, Boston, MA 02110, and Andrew D. Dunn of Devine, Millimet & Branch, 111 Amherst Street, Manchester, New Hampshire 03101.

_____
Rheba Rutkowski

-15-

LITDOCS/596267.1